**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

─────────────────────────────────

**HENRY J. KOLB,**

                             **Plaintiff,**                       **02-CV-0117A(Sr)**

**v.**

**JOHN CAMILLERI, et al.,**

                             **Defendants.**

─────────────────────────────────

## DECISION AND ORDER

Pursuant to 28 U.S.C. § 636(c), the parties have consented to the assignment of this case to the undersigned to conduct all proceedings in this case, including the entry of final judgment.  Dkt. #34.

Currently before the Court is defendants' motion for summary judgment seeking dismissal of plaintiff's complaint alleging retaliation in violation of his First Amendment rights and violation of New York Labor Law § 201-d.  Dkt. #36.  For the following reasons, the motion is granted in part and denied in part.

## BACKGROUND

Plaintiff commenced employment with the defendant Town of Tonawanda ("Town"), as a laborer at the Incinerator Plant on November 26, 1971 and transferred to the Engineering Department in 1976.  Dkt. #37, ¶ 5 & 6; Dkt. #43, ¶ 6.  Plaintiff began to perform the duties of Construction Inspector in 1980 and received the title of

Construction Inspector after the Town adopted the Civil Service title in 1994-1995.  Dkt. #43, ¶ 6.

Defendant John Camilleri was appointed by the Town Board as the Director of the Water Resources Department on July 16, 1996.  Dkt. #37, ¶ 2. Following his appointment, Mr. Camilleri conducted a needs assessment and determined that the Department needed ten additional employees.  Dkt. #37, ¶ 9. Because the Water Resources Department generated the majority of construction inspection work and had other inspection-related duties, including manhole inspections, mapping hydrant and manhole location and underground facilities protection organizations ("UFPO's") which could provide the construction inspectors with work during winter and between construction jobs, the Construction Inspectors were transferred to the Water Resources Department as part of the reorganization of the Engineering Department in 1999.  Dkt. #37, ¶ ¶ 12 & 13.  As a result, plaintiff and Charles Goetz were transferred to the Water and Sewer Maintenance Division of the Water Resources Department in February, 1999.  Dkt. #37, ¶ 14.  Project Engineer Karl Scherer and Princpal Engineering Assistant Fred Kubus were also transferred to the Water Resources Department.  Dkt. #37, ¶ 14.

Plaintiff, Mr. Goetz and Mr. Decker, a Construction Inspector already assigned to the Water and Sewer Maintenance Division, reported to Mr. Scherer.  Dkt. #37, ¶ 15.   Mr. Scherer reported to Kirk Rowland, Division Head for the Water and

Sewer Maintenance Division.  Dkt. #37, ¶ ¶ 4 & 15.  Mr. Rowland reported to Mr.

Camilleri.  Dkt. #37, ¶ 15.

Manhole inspections involve inspecting the sanitary sewer mains for

blocks or structural problems.  Dkt. #37, ¶ 20.  Plaintiff affirms that manhole inspections

were

> only added to the duties after the Construction Inspectors['] transfer to the Belmont building in 1999.  Moreover, this duty as well as others were challenged by the Inspectors as being out of title work because they were clearly laborer type work.  I protested to the point the President of the Salaried Association became involved, however he came to us to make us agree to do the work, after Mr. Camilleri's request. Additionally, our positions were threatened by Councilman Miller and Supervisor Calabrese who told Mr. Goetz that if [plaintiff] continues this action all Construction Inspectors would be laid off.  Based on this threat the Inspectors dropped the issue and began to begrudgingly perform the duties.

Dkt. #44-3, ¶ 37.

In the early Fall of 2001, Mr. Goetz asked his direct supervisor, Mr.

Scherer if he could be relieved from manhole inspections because he had recently

been spending more than fifty percent of his work time on this assignment and the

effort of pulling off the manhole covers was aggravating his physical condition, which

was subsequently diagnosed as suspected multiple sclerosis, causing severe leg

cramps.  Dkt. #61, ¶ 8.  When Mr. Scherer failed to accommodate his request, Mr.

Goetz went to Mr. Camilleri and asked to be relieved from manhole inspections.  Dkt.

#61, ¶ 8.

Mr. Camilleri avers that he was aware that Mr. Goetz' physician had written a note for his personnel file substantiating Mr. Goetz' physical limitation.  Dkt. #39, ¶ 22.  Upon review of the Construction Inspector time sheets, Mr. Camilleri confirmed, and plaintiff concedes, that Mr. Goetz had worked manhole inspections for most of 2001.  Dkt. #39, ¶ 24; Dkt. #43, ¶ 30.

Between October 23, 2001 and November 13, 2001, plaintiff picketed outside the Water and Sewer Maintenance Division facility on Belmont Street for approximately one hour each day after his work hours, Monday through Friday.  Dkt. #37, ¶ 24.   One side of the sign plaintiff carried read as follows:

TAX PAYER PROTEST

EXERCISING, MY

RIGHTS, HOW

ABOUT YOU?

STOP WASTEFUL

SPENIDNG $$$

Dkt. #44-2, p.2.  The other side of the sign read:

WATER RESOURCE

HEY, YOU!! YEA [sic], YOU

WATER RESOURCE

DEPT. IS WASTING

OUR TAX $$'S

Dkt. #44-2, p.3.  Plaintiff affirms that he was protesting the expenditure of tax dollars for

consulting by Resultant's International; installation of a sewer connection for the Town
Police Club; excessive overtime allotted to Crew Chiefs; unnecessary renovations at the
Belmont Street facility; Crew Chiefs conducting personal business during work hours;
purchase and lease of vehicles for Town employees; and waste of valuable materials.
Dkt. #44-3, ¶¶ 9-19.

Mr. Camilleri received a phone call from someone at the Belmont Street
facility on the first day of plaintiff's picketing.  Dkt. #37, ¶ 25.  Before he left for the
Belmont Street facility, Mr. Camilleri called Mr. Stocker.  Dkt. #37, ¶ 25.  Upon his
arrival at the Belmont Street facility, Mr. Stocker suggested that plaintiff should be
seeing someone, a comment plaintiff interpreted as suggesting plaintiff would not be
picketing unless he was suffering from a mental or other illness.  Dkt. #43, ¶ 27.
Plaintiff responded to this comment by stating, "I ought to knock you on your God damn
ass asking me a question like that."  Dkt. #45, p.31.  Plaintiff informed Mr. Stocker that
his picketing was a taxpayer protest over the wasted money at the Belmont Street
facility.  Dkt. #43, ¶ 26.  Plaintiff denied that the picketing was related to union activity.
Dkt. #43, ¶ 26.  At the time, plaintiff was the Town of Tonawanda Salaried Workers'
Association ("SWA"), Steward for the bargaining unit employees working for the Water
and Sewer Maintenance Division.  Dkt. #43, ¶ 23.  Plaintiff also became the Chairman
of the SWA grievance committee during this time frame.  Dkt. #43, ¶ 23.  There were no
further conversations between Mr. Camilleri and plaintiff regarding his picketing.   Dkt.
#43, ¶ 29.

On November 9, 2001, plaintiff, who had been assigned as Construction Inspector to the Various Sewer Repairs Project, was on vacation prior to the Veterans' Day weekend.  Dkt. #39, ¶ 33.  Mr. Camilleri instructed Mr. Kubus to assign Mr. Goetz as Construction Inspector to the Various Sewer Repairs Project and to continue that assignment once plaintiff returned to work.  Dkt. #39, ¶ 25.  Mr. Camillieri affirms that the reassignment was directed as an accommodation to Mr. Goetz.  Dkt. #39, ¶ 31.

Upon his return to work on November 13, 2001, plaintiff was assigned to manhole inspections.  Dkt. #37, ¶ 35.  Plaintiff affirms that manhole inspections are more physically demanding than the work required on the Various Sewer Repairs Project and required less skill and alleges that the reassignment was in retaliation for his picketing.  Dkt. #43, ¶ 36.  With the exception of a few brief construction jobs, plaintiff remained on manhole inspections until he retired.  Dkt. #43, ¶ 54.  Plaintiff affirms that following his reassignment, Crew Chiefs began to check on him and scrutinize his whereabouts.  Dkt. #44-3, ¶¶ 57-59.

Plaintiff also alleges that on December 21, 2001, he was greeted rudely and verbally attacked by Mr. Stocker at a health care arbitration he was attending in his capacity as Vice Chairman of the Grievance Committee.  Dkt. #44-3, ¶ 55.

On January 23, 2002, plaintiff, in his capacity as an employee and grievance committee chairman, filed a grievance with respect to his reassignment and

loss of overtime.  Dkt. #39-4, p.2.  Mr. Camilleri affirms that he had not considered that plaintiff would lose overtime when he directed the reassignment.  Dkt. #39, ¶ 29.

Plaintiff filed this action on February 8, 2002, alleging that Mr. Camilleri reassigned him in retaliation for his picketing.  Dkt. #1.

In the Spring of 2002, plaintiff alleges that he attended a meeting with Mr. Stocker, Mr. Rowland, Mr. Scherer, Mr. Camilleri, Mr. Moffitt and Ms. Jividen at which he was questioned about his address and compliance with the Town's residency law; acceptance of a jacket from a contractor; and payroll records.  Dkt. #44-3, ¶ 60-61.  Mr. Stocker and Mr. Scherer affirm that Mr. Stocker asked plaintiff to provide an updated address to personnel but plaintiff refused and the matter was not pursued further; Mr. Stocker asked plaintiff about time sheets which had been completed by someone else, at which point Mr. Scherer advised that he routinely completed time sheets for the Construction Inspectors; and that after Mr. Stocker inquired about a jacket with a contractor logo which plaintiff was wearing, Mr. Scherer advised that he and plaintiff had each received a jacket from the contractor as gifts, prompting Mr. Stocker to advise them that he felt that was inappropriate and direct them not to wear the jackets at work. Dkt. ##60 & 63.  Plaintiff also complains that his computer was tampered with and his Town vehicle was searched.  Dkt. #44-3, ¶ 62-63.

By Memorandum dated June 27, 2002 to all personnel in the Water Resources Department, John Camilleri advised that the State of New York was offering

an early retirement incentive and asked employees to advise if they might be interested

in the incentive, a copy of which was attached to the memorandum.  Dkt. #39-4, p.10.

Thirty-nine Town employees, including plaintiff and 13 other Water Resources

Department employees, expressed interest in the retirement incentive.  Dkt. #37, ¶ 49.


Donald Moffitt, President of the SWA, affirms that plaintiff informed him

that he planned on taking advantage of the retirement incentive and that although he

would receive less of a pension than he would receive if he continued working until age

55, he could offset that loss by performing construction inspection for the Village of

Kenmore.  Dkt. #40, ¶ 4.  Plaintiff asserts that he "intended to retire as an alternative to

continuing to work in a retaliatory and harassing environment, not because he could

earn as much retiring in 2002, at age 51, as he could retiring at age 55."  Dkt. #43, ¶ 45.


Pursuant to Mr. Camilleri's instructions, Mr. Rowland analyzed whether

the Town had sufficient construction work to justify continuing employment of the job

title of Construction Inspectors and the potential cost savings that could be achieved by

outsourcing construction inspection work.  Dkt. #37, ¶¶ 64-67.  In a report last updated

on June 26, 2002, Mr. Rowland noted that the option of outsourcing construction

inspection was discussed during the reorganization of the Engineering Department

because of the lack of year round work for the Construction Inspectors but that the

Construction Inspectors were reassigned to the Water Resources Department where

additional duties could be assigned.  Dkt. #39-4, p.21.  The report reiterated that there

was insufficient work for Construction Inspectors, noted that the Construction

Inspectors had not embraced the additional duties and had objected to the work rules at the Belmont Street facility and estimated that the Town could save approximately $91,000 by eliminating three Construction Inspector positions and outsourcing construction inspection work.  Dkt. #39, ¶ 44; Dkt. #39-4, pp.21-22.  The report also noted that:

> Henry Kolb is considering the retirement incentive opportunity;
>
> Charles Goetz could take advantage of the incentive;
>
> The Youth, Parks, and Recreation Department has voiced interest in Dave Decker;
>
> Karl Sherer would be assigned to the Technical Support Department;
>
> Fred Kubus would remain in the Water Resources Department.

Dkt. #39-4, p.21.  Mr. Camilleri discussed these findings with Town Councilman David Rider, Chairman of the Water Resources Committee and the Town Board decided to eliminate the Construction Inspector positions in July, 2002.  Dkt. #39, ¶ ¶ 45-46.


On August 21, 2002, during a grievance meeting at which plaintiff, Mr. Moffitt, Mr. Stocker, Ms. Jividen and Mr. Camilleri were present, Mr. Stocker announced that the Town was eliminating the Construction Inspector position at the end of the construction season.  Dkt. #39, ¶ 48; Dkt. #40, ¶ 6.  Plaintiff responded that "he had already planned on leaving to go to work for . . . Kenmore, if the Town adopted the incentive."  Dkt. #43, ¶ 53.  Plaintiff had previously been contracted out to the Village of Kenmore to perform inspection work.  Dkt. #37, ¶ 21.

Immediately after the meeting, plaintiff asserts that he realized that "he may be able to continue to work with the Town by being transferred to another department," and telephoned Ms. Jividen to inform her of his interest in transferring to another department.  Dkt. #43, ¶ 75.

On August 26, 2002, the Town Board formally adopted the retirement incentive.  Dkt. #37, ¶ 51.  Eligible employees were provided a sixty day window extending from November 1 to December 30, 2002, to take advantage of the retirement incentive.  Dkt. #37, ¶ 53.

On October 7, 2002, plaintiff wrote a letter to Raymond Greene, Municipal Service Division, New York State Department of Civil Service seeking assistance with respect to his request to the Erie County Civil Service for "an aggressive intervention . . . in the Town of Tonawanda's attempt to abolish the Civil Service Job Title of Construction Inspector." Dkt. #52, p.2.  On the same date, plaintiff wrote the following letter to John Greenan, Commissioner, Erie County Civil Service:

> Earlier this year I was in contact with Mr. Bill Barto of your office.  At that time I had requested his assistance with job descriptions and duties of the Construction Inspectors here in the Town of Tonawanda.  I had complained that the Town was utilizing people other than Construction Inspectors to perform work historically performed by inspectors or those who were employed in the Town's Engineering Department.
> . . . This is not a violation of the CBA but a misuse of Civil Service job descriptions. At the end of our conversation I reluctantly agreed to pursue this issue through the first steps of the grievance procedure but not as far as arbitration.  The attached grievances were presented to Mr. Norm Stocker, the Towns [sic] Labor Consultant at a meeting held on

August 21, 2002. . . . As of this date there had been no response. . . . My argument that Crew chiefs were being utilized to perform inspection duties has grown dramatically. . . . The Town is taking advantage of a clause in the Hourly Workers Associations [sic] CBA . . . that provides for out of title pay for those employees performing the duties of Crew Chief.  At the same time the Town is assigning Crew Chiefs to the Construction Inspectors [sic] work.

. . . The Salaried Workers['] Association has been informed that the Town plans to abolish the position of Construction Inspector and at the end of this year's construction season it will then layoff all 3 employees holding that position.

* * *

Currently the Town is utilizing hourly workers to perform the duties of Crew Chiefs.  Crew Chiefs are now doing inspection work of inspectors.  Now the Town is going to abolish the Civil Service title of Construction Inspector.  This does just not make sense.  I am CERTAIN that this practice will continue after the Construction Inspectors are gone.  It is for these reasons and so many more that cannot be explained in this request that I ask for your assistance.  Your immediate attention is urged due to the pending layoffs.  Please don't delay.

I have been employed by the Town for nearly 31 years.  A many number of those years as a representative of both the Hourly & Salaried Workers['] Union.  The Town has gotten away with abusing job titles and duties for years.  It's time someone put a stop to this abuse.

Very truly yours,

Henry J. Kolb
Town of Tonawanda Salaried Association
Grievance Committee Chairman

Dkt. #52, pp.3-4.

On November 4, 2002, plaintiff sent the following letter to Susan Jividen,

the Personnel Supervisor:

> This correspondence confirms our recent phone con[vers]ation and serves as notice that as a result of the pending construction inspectors lay-off, I will be retiring under the current retirement incentive program, effective November 26, 2002.

Dkt. #39-4, p.16.

On or about November 21, 2002, plaintiff contacted Ms. Jividen because he had learned other employees would be absorbed into other departments and informed her that "he would consider a transfer in lieu of retirement as well, and inquired what department he may be absorbed into."  Dkt. #49, p.9.  "On or about the following day, Ms. Jividen replied to Plaintiff via telephone and informed Plaintiff she was forwarding a message from Mr. Stocker, the message was, 'At the end of this year's construction season the Civil Service position of Construction Inspector would be dissolved and ALL the inspectors would be laid off."  Dkt. #49, p.9.

On November 22, 2002, plaintiff wrote a letter to Joseph Conboy, Municipal Service Division, New York State Department of Civil Service, complaining of the lack of response from the Erie County Personnel Office with respect to the pending layoff of the Construction Inspectors and advising as follows:

> I believe that these lay-offs are contrived by the Towns [sic] manipulating of Civil Service Titles and Duties.
>
> On Wednesday November 20th a P.E.R.B. hearing was held.  The subject of this hearing was [a] small but somewhat relevant piece to this issue.  The Town clearly admitted that they had been using maintenance people to do the work of the crew chiefs thus freeing up crew chiefs to do other work.  Although the Town did not specifically say that

the crew chiefs were now performing the work of the
construction inspector.

The Town states that at the end of this year's
construction season that they will abolish the title of
Construction Inspector and lay off those holding that title.  I
and one other inspector happen to be eligible for the
retirement incentive being offered and adopted by the Town.
I have 31 years of service with the Town but I am only fifty
years young.  That means that I'm penalized 5% per year for
each year under fifty-five.  According to the projected
retirement print out provided to me by the N.Y.S. Retirement
Councilors I am losing TEN THOUSAND dollars per year.
The Town has given no defined date that this pending lay-off
process will take place, only that it will.  As I'm sure you are
aware that there is a small window of opportunity in order to
take advantage of this offer.  Being that the Town has given
no specific date for this pending action and only a limited
opportunity for some retirement benefit I have chosen to
play it safe and take the FORCED lay-off and my last day of
employment will be November 25th 2002.

Dkt. #52, pp.6-7.

Plaintiff retired effective November 26, 2002.  Dkt. #37, ¶ 57.  Although

Mr. Goetz was also eligible for the retirement incentive, he chose not to retire.  Dkt. #61,

¶ 10.  Mr. Goetz affirms that he "had not secured employment with the Town beyond

the end of the construction season" and believed at that time that he "would be laid off

when the Construction Inspector position was eliminated if [his] attempts to secure

continued employment with the Town were not successful."  Dkt. #61, ¶ 13.  In all,

thirty-five Town employees, including plaintiff and Fred Kubus, Principal Engineering

Assistant for the Water and Sewer Maintenance Division, accepted the retirement

incentive.  Dkt. #37, ¶¶ 61-62.

On December 6, 2002, Mr. Moffitt met with Mr. Camilleri, Mr. Stocker and Ms. Jividen to ask whether the Town could find jobs for Mr. Goetz and Mr. Decker.  Dkt. #40, ¶ 9.

On December 12, 2002, Susan Jividen sent Charles Goetz and David Decker letters informing them that the

> Town of Tonawanda is eliminating the job title of construction inspector.  Your service as an inspector with the town will officially end as of January 15, 2003.  As a result of the elimination of this position, your name will be placed on a preferred eligible list with Erie County Civil Service.
>
> The Salaried Workers' Association has requested that the town consider your placement in another position within the town.

Dkt. #38-4, pp.37-38.

Pursuant to the SWA's request, a meeting was convened on December 17, 2002, with Ms. Jividen, Mr. Camilleri, Daniel Wiles, the Director of Youth, Parks and Recreation Department, Town Councilman Bill Miller and Town Councilman Rider to discuss other employment opportunities for Mr. Goetz and Mr. Decker.  Dkt. #37, ¶ 84.  Mr. Camilleri avers that because of the number of employees who took advantage of the retirement incentive, there was an opening for Mr. Goetz as Crew Chief with the Youth, Parks and Recreation Department.  Dkt. #39, ¶¶ 53-54.  Mr. Camilleri also avers that the Water Resources Department was able to retain Mr. Decker, albeit in a different capacity, as a result of Mr. Kubus' retirement.  Dkt. #39, ¶ 53.

Mr. Camilleri affirms that these "jobs were not available when the Town announced its decision to eliminate the Construction Inspector position."  Dkt. #39, ¶ 54.  Plaintiff asserts that only three of seven individuals in the Parks Department who initially expressed interest in the incentive retired and claims that "the fact that Mr. Goetz never made arrangements to take the incentive, even though he was eligible, suggests he had inside information from his political connection that his employment with the Town was going to continue after the elimination of the Construction Inspector division."  Dkt. #43, ¶ 78.

After the December 17, meeting, Ms. Jividen contacted Erie County Civil Service to ask whether Mr. Goetz and Mr. Decker could be placed in the proposed positions.  Dkt. #37, ¶ 88.  The Erie County Civil Service informed Ms. Jividen that Mr. Goetz could be placed in the Crew Chief position, but Mr. Decker's name would have to be placed on a preferred eligible list because the Senior Engineering Assistant position was classified as competitive.  Dkt. #37, ¶ 89.  As Mr. Goetz was the only other person on the preferred eligible list for the Senior Engineer Assistant, and he declined the position despite his seniority, Erie County Civil Service afforded Mr. Decker temporary approval for the position pending approval from the New York State Department of Civil Service.  Dkt. #37, ¶ ¶ 91-92; Dkt. #38-4, pp.44-45.

On January 27, 2003, the Town Board passed a resolution changing Mr. Goetz' job title to Youth, Parks and Recreation Department Crew Chief and Mr. Decker's job title to Senior Engineer Assistant – Temporary.  Dkt. #37, ¶ 93.

Plaintiff's grievance was resolved in February, 2003 with a settlement in which plaintiff agreed that he would make no claim for lost overtime hours in this action and the Town agreed to pay plaintiff the equivalent of 26 hours overtime.  Dkt. #39-4, ¶ 4.

Mr. Decker's appointment became permanent on March 25, 2003.  Dkt. #37, ¶ 94.

## DISCUSSION AND ANALYSIS

### Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a pro se plaintiff."  *Thomas v. Irvin*, 981 F. Supp. 794, 799 (W.D.N.Y. 1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson*, 477 U.S. at 248; *see Bryant v. Maffucci*, 923 F.2d 979 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant*, 923 F.2d at 982.   A party seeking to defeat a motion for summary judgment

> must do more than make broad factual allegations and invoke the appropriate statute.  The [party] must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial.

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).

Pursuant to Fed. R. Civ. P. 56(e), affidavits in support of or in opposition to a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."  Thus, affidavits "must be admissible themselves or must contain evidence that will be presented in an admissible form at trial."  *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001), *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *see also H.Sand & Co. v. Airtemp Corp.*, 934 F.2d 450, 454-55 (2d Cir. 1991) (hearsay testimony that would not be admissible if testified to at trial may not properly be set forth in an affidavit).

First Amendment Retaliation

      "To establish a First Amendment retaliation claim, a plaintiff must show: (1) his speech addressed a matter of public concern; (2) he suffered an adverse employment action; and (3) a causal connection between the speech and the adverse employment action.  *Singh v. City of New York*, 524 F.3d 361, 372 (2d Cir. 2008).

Matter of Public Concern

      "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record."  *Connick v. Myers*, 461 U.S. 138, 147-48 (1983).  "As a general rule, speech on 'any matter of political, social or other concern to the community' is protected by the First Amendment."  *Mandell v. County of Suffolk*, 316 F.3d 368, 383 (2d Cir. 2003), *quoting Connick*, 461 U.S. at 146.  "So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively."  *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006).

      In contrast, "when an employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."  *Connick*, 461 U.S. at 147.  Complaints which

are motivated by and related to an employee's personal grievances and individual

employment situation generally fail to meet the standard.  *See Saulpaugh v. Monroe*

*Community Hosp.*, 4 F.3d 134, 143 (2d Cir. 1993), *cert. denied*, 510 U.S. 1164 (1994);

*Ezekwo v. New York City Health & Hospitals Corp.*,  940 F.2d 775, 781 (2d Cir.), *cert.*

*denied*, 502 U.S. 1013 (1991).  Whether an employee's speech addresses a matter of

public concern is a question of law for the court to decide.  *See Cioffi v. Averill Park*

*Central Sch. Dist.*, 444 F.3d 158, 163 (2d Cir.), *cert. denied*, __ U.S. __, 127 S.Ct. 382

(2006).


            In the instant case, plaintiff's criticism of wasteful government spending

clearly addresses a matter of public concern.  *See Lewis v. Cowen*, 165 F.3d 154, 164

(2d Cir.) ("Courts have frequently found that the public fisc is a matter of public

concern."), *cert. denied*, 528 U.S. 823 (1999); *see also Gorman-Bakos v. Cornell Co-op*

*Extension of Schenectady Cty*, 252 F.3d 545, 553 n.4 (2d Cir. 2001) (collecting cases).

Moreover, the time, manner and place of plaintiff's criticism, *to wit*, picketing outside of

the Water and Sewer Maintenance Building after work hours, minimizes concern that

plaintiff's speech would disrupt government operations.  *Id.* at 162.  Finally, plaintiff was

not in a policymaking or confidential position in which such speech would be considered

more likely to disrupt the public workplace.  *See McEvoy v. Spencer*, 124 F.3d 92, 103

(2d Cir. 1997) ("Common sense tells us that the expressive activities of a highly placed

supervisory, confidential, policymaking, or advisory employee will be more disruptive to

the operation of the workplace than similar activity by a low level employee with little

authority or discretion.").  Accordingly, plaintiff has established the first element.

Adverse Employment Action

With respect to the second element, plaintiff alleges that he suffered an adverse employment action when he was reassigned to manhole inspections and when he was forced to retire. Dkt. #54, pp.12-13. In the context of a First Amendment retaliation claim, the Court of Appeals for the Second Circuit has held that "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action." *Zelnik v. Fashion Inst. of Tech*., 464 F.3d 217, 225 (2d Cir. 2006), *cert. denied*, __ U.S. __, 127 S.Ct. 2062 (2007). "In this context, '[a]dverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Id. at 226, quoting Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999). This list is not exhaustive and the determination is guided by the general rule that whether an undesirable employment action qualifies as being adverse is a heavily fact-specific, contextual determination. *Id.* However, the alleged act of retaliation must be more than *de minimis. Id.*


In the instant case, there is no dispute but that manhole inspections were more physically demanding than construction inspection and that assignment to construction inspection presented opportunities for overtime. This is sufficient evidence from which a jury could reasonably conclude that the reassignment of duties would be materially adverse to a reasonable employee. *See Burlington Northern v. White*, 548 U.S. 53, 70-71 (2006) ("Common sense suggests that one good way to discourage an employee . . . from bringing . . . charges would be to insist that []he spend more time

performing the more arduous duties [that fall within the same job description] and less time performing those that are easier or more agreeable.").

Turning to plaintiff's claim of forced retirement, however, the Court notes that plaintiff "does not claim that the elimination of the Construction Inspector position was an adverse employment action." Dkt. #54, p.22. Instead, plaintiff challenges the Town's misinformation concerning his prospects for continued employment with the Town. Specifically, plaintiff contends that "the Town forced me to retire by providing me with false information concerning when the elimination was to take place and denying me the opportunity that was afforded to Mr. Decker and Mr. Goetz with regard to absorption into other departments. Dkt. #44-3, ¶ 89. However, plaintiff can put forth nothing more than his own speculation that the information provided was incorrect at the time it was communicated to him. Thus, plaintiff cannot establish that the information provided to him with respect to his prospects for continued employment following the elimination of the civil service position of Construction Inspector constitutes an adverse employment action.

Causal Connection

"To establish causation, a plaintiff must show that the protected speech 'was a substantial motivating factor in the adverse employment action.'" *Cioffi*, 444 F.3d at 167, *quoting Morris*, 196 F.3d at 110. "Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the

protected activity was followed by adverse treatment in employment, or directly by

evidence of retaliatory animus." *Morris*, 196 F.3d at 110.  As plaintiff was reassigned to

the more physically demanding, less intellectually demanding assignment of manhole

inspections during the time period he was picketing, plaintiff has produced sufficient

circumstantial evidence of causation to permit this claim to proceed.


However, there is no evidence to suggest that the Town informed plaintiff

that the Construction Inspectors would be laid off at the end of the construction season

because of his protected activity and this conduct did not occur sufficiently close to

plaintiff's protected activity to infer such causation.  Although the Court of Appeals for

the Second Circuit "has not established a specific delay between protected activity and

adverse employment action that defeats an inference of causation," case law suggests

that nine months is too long.  *Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union*

*Free Sch.*, 411 F.3d 306, 313 (2d Cir.), *cert. denied*, 546 U.S. 1062 (2005); *see Clark*

*County Sch. Dist. v. Breeden,* 532 U.S. 268, 273 (2001) ("The cases that accept mere

temporal proximity between an employer's knowledge of protected activity and an

adverse employment action as sufficient evidence of causality to establish a prima facie

case uniformly hold that the temporal proximity must be 'very close.'"); *Cioffi,* 158 F.3d

at 168 (collecting cases); *Gormon-Bakos,* 252 F.3d at 555 (collecting cases); *Deebs v.*

*Alstom Transp., Inc.*, 550 F. Supp.2d 385, 392 (W.D.N.Y. 2008) ("district courts within

the Second Circuit have consistently held that the passage of two to three months

between the protected activity and the adverse employment action does not allow for an

inference of causation"), *quoting Murray v. Visiting Nurse Servs. of N.Y.*, 528 F.

Supp.2d 257, 271 (S.D.N.Y. 2007) (collecting cases).

Accepting plaintiff's argument that plaintiff's forced retirement was put into

motion on August 21, 2002, when plaintiff was informed that the position of

Construction Inspector would be eliminated and the Construction Inspectors would be

laid off at the end of the construction season, the Court is of the opinion that too much

time had passed to infer that this announcement was substantially motivated by

plaintiff's picketing.  The Court adopts the same opinion if the protected activity is

defined as the filing of his grievance on January 23, 2002 or the filing of this complaint

on February 8, 2002, thereby reducing the delay to six or seven months.  Thus, the

Court holds that plaintiff has also failed to establish the causation element of a first

amendment retaliation claim with respect to his allegations of forced retirement.

Non-Retaliatory Motive

If a plaintiff makes the required showing, defendants may nevertheless

escape liability if they can demonstrate that either (1) the defendants would have taken

the same adverse action against the plaintiff regardless of the plaintiff's speech; or (2)

the plaintiff's expression was likely to disrupt the government's activities and that the

harm caused by the disruption outweighs the value of the plaintiff's expression.

*Mandell*, 316 F.3d at 382-83.

Defendants assert that they would have reassigned plaintiff even if he hadn't engaged in picketing because Mr. Goetz' physical limitations warranted relief of his nearly year-long assignment to manhole inspections.  However, there remain questions of fact with respect to the timing of the reassignment, as Mr. Goetz had requested reassignment from his direct supervisor and Mr. Camilleri, without relief, prior to plaintiff's picketing.  Dkt. #61, ¶ 8.   Moreover, there is a question of fact as to whether relieving Mr. Goetz from manhole inspections required assignment of plaintiff to this duty given that there were three Construction Inspectors and plaintiff affirms that another construction inspection project, the Paddock Golf Dome project began on or about November 13, 2001.  Dkt. #44-3, ¶ 51.  Thus, defendants' motion for summary judgment is denied with respect to plaintiff's claim that he was reassigned to manhole inspections in retaliation for his picketing.


Qualified Immunity

Mr. Camilleri argues that he should be shielded by the doctrine of qualified immunity.  Dkt. #41, p.28.  Specifically, he asserts that

> It was reasonable for Camilleri not to have known that by agreeing to accommodate Charles Goetz because of his physical limitation which resulted in Plaintiff's assignment to Manhole Inspections, there was a risk of First Amendment violation because of Plaintiff's recent picketing.

Dkt. #41, p.29.


"The qualified immunity doctrine shields government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does

not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Lewis*, 165 F. 3d at 166 (internal quotation omitted). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time it was taken." *Id.*   Courts must be careful not to define the constitutional right too broadly, lest the doctrine be converted "into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."  *Id.* at 167.

Mr. Camilleri's framing of the issue begs the factual question which must be determined by a jury.  If Mr. Camilleri assigned plaintiff to manhole inspections in retaliation for his picketing, he cannot escape liability behind the doctrine of qualified immunity because a reasonable person should have known that it was improper to assign an employee less desirable duties because the employee exercised his constitutional right to criticize wasteful government spending.  Accordingly, defendant's motion for summary judgment on the ground of qualified immunity is denied.

New York Labor Law § 201-d

Defendants argue that picketing is not protected by New York Labor Law § 201-d because picketing is not a recreational activity.  Dkt. #41, pp.24-25.

Plaintiff responds that picketing falls within the statutory definition of recreational activity and is, therefore, protected by the statute.  Dkt. #54, pp.23-24.

New York Labor Law § 201-d prohibits an employer from refusing to hire or discharging from employment or otherwise discriminating against an individual in compensation, promotion or terms, conditions or privileges of employment because of "an individual's legal recreational activities outside work hours, off the employer's premises and without use of the employer's equipment or other property."  N.Y. Labor Law § 201-d(2)(c).  Recreational activities are defined as "any lawful, leisure-time activity, for which the employee receives no compensation and which is generally engaged in for recreational purposes, including but not limited to sports, games, hobbies, exercise, reading and the viewing of television, movies and similar material."  N.Y. Labor Law § 201(1)(b).

Interpretation of this provision has largely focused on an employer's ability to terminate employees engaging in romantic relationships.  In *State v. Wal-Mart Stores, Inc.*, for example, the New York State Appellate Division, Third Department, determined that "'dating'" is entirely distinct from and, in fact, bears little resemblance to 'recreational activity.'" 207 A.D.2d 150, 152 (3rd Dep't 1995).  The Appellate Division continued as follows:

> Whether characterized as a relationship or an activity, an indispensable element of "dating", in fact its raison d'etre, is romance, either pursued or realized.  For that reason, although a dating couple may go bowling and under the circumstances call that activity a "date", when two individuals lacking amorous interest in one another go bowling or engage in any other kind of "legal recreational activity", they are not "dating".
>
> Moreover, even if Labor Law § 201-d(1)(b) was found to contain some ambiguity, application of the rules of statutory construction does not support Supreme Court's

-26-

> interpretation.  We agree with defendant that, to the extent
> relevant, the voluminous legislative history to the enactment,
> including memoranda issued in connection with the veto of
> two earlier more expansive bills . . . evinces an obvious
> intent to limit the statutory protection to certain clearly
> defined categories of leisure-time activities.  Further, in view
> of the specific inclusion of "sports, games, hobbies,
> exercise, reading and the viewing of television, movies and
> similar material" within the statutory definition of "recreational
> activities" . . . application of the doctrine of *noscitur a sociis*[1]
> compels the conclusion that personal relationships fall
> outside the scope of legislative intent.

*Id.*  The Court of Appeals for the Second Circuit relied upon this analysis in the factually

similar case of *McCavitt v. Swiss Reinsurance America Corp.*, in which it found

> no persuasive evidence – nothing in logic, the language of
> § 201-d, its legislative history, or New York state case law –
> that leads us to conclude that the New York Court of
> Appeals would hold that romantic dating is a "recreational
> activity" under New York Labor Law § 201-d(1)(b) contrary to
> the holding of *Wal-Mart*.

237 F.3d 166, 168 (2d Cir. 2001).


Applying this analysis to the instant case, the Court concludes that

plaintiff's picketing falls outside of the definition of recreational activities.  Plaintiff did

not engage in picketing for his leisure, but as a form of protest.  While the Court has

found such protest worthy of constitutional protection, it should not engender

simultaneous protection as a recreational activity akin to "sports, games, hobbies,

exercise, reading and the viewing of television, movies and similar material."

---

[1] "A canon of construction holding that the meaning of an unclear word or phrase should be determined by the words immediately surrounding it."  Black's Law Dictionary 1084 (7th ed. 1999).

Accordingly, plaintiff's cause of action for violation of section 201-d of New York's Labor Law is dismissed.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (Dkt. #36), is granted with respect to the first cause of action relating to plaintiff's allegation of forced retirement in retaliation for the exercise of his First Amendment rights and with respect to the second cause of action alleging violation of New York Labor Law § 201-d; and denied with respect to the first cause of action relating to plaintiff's allegation of reassignment to manhole inspections in retaliation for the exercise of his First Amendment rights.

**SO ORDERED.**

DATED:      Buffalo, New York
            August 1, 2008


  **s/ H. Kenneth Schroeder, Jr.**
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**